**Corinthians R. GUY, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 07 Civ. 2682 (FM).**

United States District Court, S.D. New York.

April 15, 2009.

---

**95.** This does not bar LinkCo from bringing claims that are not based on issues litigated in *LinkCo I.*

Corinthians R. Guy, New York, NY, pro se.

Leslie A. Ramirez–Fisher, United States Attorney's Office, New York, NY, for Defendant.

### DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

*Pro se* plaintiff Corinthians Guy ("Guy") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), to seek review of a final decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his application for Supplemental Security Income ("SSI") and disability insurance benefits. The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's motion, to which Guy has not responded, is granted.

### I. *Background*

#### A. *Procedural History*

On September 26, 2003, Guy filed an application for SSI and disability benefits, alleging disability beginning on July 8, 1996. (Tr. 13).[1] Guy claimed that he was

---

**1.** Citations to "Tr." refer to the certified copy of the administrative record filed with the

disabled because of post-concussion syndrome, lower back pain, arthritis, periodic seizures, and psychiatric problems. (*Id.*). After Guy's application initially was denied, he requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 45). On March 1, 2006, ALJ Kenneth Levin held that hearing, at which Guy was represented by counsel. (*Id.* at 428–509). On March 15, 2006, the ALJ issued a decision in which he concluded that Guy was not disabled. (*Id.* at 10–30). That decision became the final decision of the Commissioner on December 22, 2006, when the Appeals Council denied further review. (*Id.* at 2–4).

Guy commenced this action on April 2, 2007. (Docket No. 2). On November 7, 2007, the Commissioner filed his motion for judgment on the pleadings pursuant to Rule 12(c). (Docket No. 9). Guy did not submit papers in opposition to the motion. Thereafter, on January 7, 2009, the parties consented, pursuant to 28 U.S.C. § 636(c), to my jurisdiction to decide the motion. (Docket No. 17).

The issue presented is whether the ALJ's determination that Guy was not under a "disability" within the meaning of the Act is legally correct and supported by substantial evidence.

## II. *Relevant Facts*

### A. *Non–Medical Evidence*

Guy was born on October 16, 1943, is a high school graduate, and was 62 years old on the date of the hearing. (Tr. 58, 61, 433). Guy worked as a driver for a limousine company between 1969 and 1971, and as a construction laborer between 1971 and 1989. (*Id.* at 53). Thereafter, from 1989 to 1997, Guy worked as a locksmith and elevator operator. (*Id.*). He also taught martial arts during the 1980s and 1990s. (*Id.* at 436).

Answer. (Docket No. 5).

On July 8, 1996, a tile that fell from a second-story building facade hit Guy on the head. (*Id.* at 345–46). At a medical examination on October 15, 1997, Guy reported that he had returned to light security work several months after the incident, and that he presently was working in his own business as a locksmith. (*Id.* at 335).

At the time of the hearing, Guy lived with his wife, his son, and two grandchildren in a second-floor loft which was accessible by elevator. (*Id.* at 445–46). In response to questions about his daily routine, Guy stated that he would bathe and dress himself in the morning and then spend most of his day watching television while seated. (*Id.* at 441–42). He did not help with any household chores, but sometimes would accompany his wife to go grocery shopping. (*Id.* at 442, 444). He was able to carry a gallon of milk. (*Id.* at 444). He occasionally visited with family and friends, if they picked him up and escorted him to the destination. (*Id.*). Guy testified that he never used the subway or bus because it was "too much on [his] back." (*Id.* at 446). He arrived at the ALJ hearing by cab, accompanied by his wife. (*Id.*). Guy testified that was able to walk about one block, stand for one-half hour, and sit for about one and one-half hours. (*Id.* at 447–48).

Guy stated that, in addition to his headaches and back pain, his forgetfulness rendered him unable to work. (*Id.* at 447). He stated that he would get lost even in his own neighborhood. (*Id.*). Guy also professed difficulty recalling such personal details as his work history, whether there was a martial arts studio in his home, the extent of his back pain, and the ages of his grandchildren. (*Id.* at 433–39, 445).

Guy's wife, Penny Guy ("Mrs. Guy"), also testified at the hearing. She stated that after the 1996 incident, Guy was tired, out of sorts, and did not work for several months. (*Id.* at 454). Mrs. Guy further stated that Guy returned to work in the fall of 1996, after which he worked for about one and one-half months, stopping because the company did not need him anymore. (*Id.* at 455–56). During this period, he also taught martial arts at a dojo in his loft. (*Id.* at 456–57). In 1997 or 1998, Guy began to have difficulties remembering the differences among several martial arts styles, and he and his wife decided that she should run the studio. (*Id.* at 457). Guy stopped working as a martial arts instructor in 2000. (*Id.* at 460). Mrs. Guy stated that Guy had not worked for pay at any job since 2001, other than a short-term holiday job in 2002 or 2003. (*Id.* at 460–61).

Vocational expert Mark Ramnauth ("Ramnauth") also testified at the hearing. Ramnauth stated that Guy's past work as a locksmith was a skilled occupation with an SVP of 6,[2] which was considered light duty. (*Id.* at 504). He further testified that martial arts teaching was a light duty occupation with an SVP of 7. (*Id.*). Finally, Ramnauth stated that Guy's prior jobs as an elevator operator and security guard also were light duty, with SVPs of 2 and 3, respectively. (*Id.*). According to Ramnauth, about 50,000 security jobs existed in New York, and he described elevator operator work as "simple and routine." (*Id.* at 505).

### B. *Medical Evidence*

After he was struck by the tile on July 8, 1996, Guy was evaluated at the St. Vincent's Hospital emergency room. (*Id.* at 344–50). His primary complaints were a headache and throbbing on the left side of his head. (*Id.* at 344). Guy denied losing consciousness, but reported having a short period of "haziness" immediately following the accident. (*Id.* at 345). At a neurological examination on July 12, 1996, Guy again complained of a left-side headache. (*Id.* at 352). The doctor's notes reflect diminished sensation in Guy's left temporal scalp region. (*Id.*). Guy was prescribed Motrin on discharge. (*Id.* at 353).

### 1. *Dr. Irving Friedman—Treating Neurologist*

On July 16, 1996, Guy was examined by Dr. Irving Friedman, a board certified neurologist, at Greater Metropolitan Medical Services ("GMMS"). Guy complained of an "intermittent throbbing left-sided, biparietal and vertex headache accompanied by dizziness, nausea, blurred vision and light-headedness." (*Id.* at 301). He also reported neck pain that extended to his left shoulder, and that he had experienced insomnia, depression, irritability, and memory difficulties since the accident. (*Id.*).

On neurological examination, Dr. Friedman noted that Guy was awake, alert and oriented. (*Id.* at 302). Tests of Guy's cognitive functions also were normal. (*Id.*). He had tenderness of the cervical spine and paracervical muscle spasm, as well as some restriction of motion in the neck. (*Id.*). A subsequent EEG and an

**2.** The Commissioner notes that "SVP" is an acronym for "specific vocational preparation," which is the amount of time required to learn techniques and information and develop the facility needed for the performance of a job. (Resp't's Mem. at 2 n. 2). An SVP of 6 indicates a period greater than one but no more than two years; an SVP of 7 indicates a period greater than two but no more than four years; an SVP of 2 indicates something beyond a short demonstration up to a one-month period. (*Id.* at 2 n. 2, 3 n. 3–4). A job with an SVP of 2 is considered unskilled work. *See* 20 C.F.R. § 404.1568(a).

MRI scan were normal. (*Id.* at 395–96, 401). X-rays of the skull and temporomandibular joints also were normal. (*Id.* at 399–401). Dr. Freidman's diagnostic impressions were post-concussion syndrome, post-traumatic vestibulopathy,[3] post-traumatic stress disorder, post-traumatic headaches, and left cervical myofascitis.[4] (*Id.* at 302). He concluded that Guy's prognosis was guarded. (*Id.* at 303).

Dr. Friedman examined Guy an additional five times in late 1996 and early 1997. (*Id.* at 401). During these follow-up visits, Guy complained of "[l]eft-sided head pains, headaches, ringing in [his] ears, difficulty reading due to 'foggy' vision, difficulty eating due to [his] jaw 'snapping' shut, [and] neck pain." (*Id.*). Dr. Friedman treated Guy with physical therapy, instruction, continued support, and observation. (*Id.*). Guy continued to be treated by Dr. Friedman from March 1997 to June 1998. (*Id.* at 404). During these visits, Guy complained of intermittent headaches with left eye pain. (*Id.*). Dr. Friedman's diagnosis was post-traumatic headaches. (*Id.*). On May 16, 1997, a brainstem auditory evoked response test was normal. (*Id.* at 403–04). On June 18, 1998, Dr. Friedman reported that Guy had suffered a "causally[-]related permanent partial functional impairment of the cervical spine and spinal roots." (*Id.* at 404–05).

### 2. *Dr. Arthur Helft—Consulting Physician*

On October 14, 1997, Dr. Helft examined Guy in connection with his worker's compensation claim. (*Id.* at 335–36). Guy reported to Dr. Helft that he had been out of work for several months after the incident, but then had returned to light security work. (*Id.* at 335). On the date of the examination, he was working in his own business as a locksmith. (*Id.*).

Guy complained of pain and headaches on his left side occurring every other day, as well as dizziness and tightness in his neck. (*Id.*). Dr. Helft's examination revealed tightness in the neck, but no spasm. (*Id.* at 336). Guy's range of motion in his neck was normal, as was a neurological exam. (*Id.*). Dr. Helft determined that Guy had no disability and could continue to work, but he recommended monthly follow-up visits with a physician for symptomatic complaints, and a neurological examination if Guy's symptoms persisted. (*Id.*).

On August 11, 1998, Dr. Helft again examined Guy, who had not worked since the last visit. (*Id.* at 337–38). Guy complained of constant pain on the left side of his head, which radiated to his neck and the back of his left shoulder. (*Id.* at 337). His pain was reduced by rest and pain killers. (*Id.*). On examination, Guy was alert and oriented. (*Id.*). A neurological exam was within normal limits, although Guy had decreased sensation to pin pricks on his left arm, face, and forehead. (*Id.* at 337–38). There was no tenderness or spasm in his neck, which had full range of motion, albeit with some pain. (*Id.* at 338). Dr. Helft concluded that Guy's physical examination was "within normal limits," and that he could work because there was no "causally[-]related disability." (*Id.*).

### 3. *Dr. Lawrence Shields—Neurologist*

On May 11, 1999, Dr. Shields, a board certified neurologist, examined Guy and reviewed the GMMS records, apparently at the request of Guy's counsel. (*Id.* at 406–09). Guy complained of persistent daily headaches since the accident, as well as

---

**3.** Vestibulopathy is "[a]ny abnormality of the vestibular apparatus" of the ear. *Stedman's Medical Dictionary* (27th ed. 2000) ("*Stedman's*").

**4.** Myofascitis, also known as "myositis fibrosa," is an "induration of a muscle through an interstitial growth of fibrous tissue." *Stedman's.*

neck and upper-back pain that radiated into his left arm. (*Id.* at 407). Guy also reported occasional visual fogginess, as well as irritability and difficulty sleeping. (*Id.*). Guy stated that he slept a lot during the day and that his activities included reading and watching television. (*Id.*).

On neurological examination, Dr. Shields observed that Guy was awake, alert, and oriented. (*Id.*). His mental and language functions were within normal limits. (*Id.*). His memory retrieval was adequate, except for a gap concerning the details of the incident. (*Id.*). Dr. Shields noted left eyelid ptosis [5] and bilateral pinpoint pupils, as well as restricted motion of the cervical spine and bilaterally positive Spurling signs.[6] (*Id.* at 408). Dr. Shields further noted paracervical muscle spasm with diffuse percussion tenderness along the spine, and a positive Valleix sign [7] over the left median nerve. (*Id.*). Otherwise, the neurological exam was within normal limits. (*Id.*).

Dr. Shields' diagnosis was "status-post closed head trauma," post-concussion syndrome, post-traumatic headaches, post-traumatic stress disorder with depression, chronic recurrent cervical myofascitis, left cervical radiculopathy, left Horner's syndrome,[8] sexual dysfunction, and pinpoint pupils. (*Id.*). He concluded that Guy had sustained a permanent partial functional impairment of the cervical spine and left spinal roots, and that his "post-concussion syndrome, including headaches, post-traumatic stress disorder and depression, meets the medically accepted criteria for permanency." (*Id.* at 409).

#### 4. Dr. Sherwood Jacobson—Consulting Neurosurgeon

Dr. Jacobson examined Guy on February 24, 2000, at the request of the State Insurance Fund. (*Id.* at 339–41). During the examination, Guy complained of occasional headaches, which were controlled by Advil. (*Id.* at 339). Guy reported that he had returned to work as a locksmith two or three months earlier and was working full time. (*Id.*). On physical examination, Dr. Jacobson found no medical or neurological defects. (*Id.* at 340). Dr. Jacobson concluded that there was no need for treatment because there was "no injury," (*id.* at 341), and that Guy could work full time, (*id.* at 340).

#### 5. Dr. Brian Healy—Treating Psychologist

Dr. Shields referred Guy to Dr. Healy who examined him on four dates in April 2000 to assess the extent of any neuropsychological dysfunction. (*Id.* at 355–61). At that time, Guy was working as a locksmith and a martial arts instructor. (*Id.* at 355). Guy reported memory problems, difficulty concentrating, irritability, and difficulty retaining his thoughts after the accident. (*Id.*). On examination, Guy was friendly and cooperative. (*Id.* at 356).

---

**5.** Ptosis is a "sinking down or prolapse of an organ." *Stedman's.* Aponeurogenic ptosis refers to "drooping of the eyelid caused by dehiscence of the tendon of the levator muscle." *Id.*

**6.** A Spurling test is an "evaluation for cervical nerve root impingement in which the patient extends [his] neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." *Stedman's.*

**7.** A Valleix point, also known as a tender point, refers to "various points in the course of a nerve, pressure upon which is painful in cases of neuralgia." *Stedman's.*

**8.** Horner's syndrome refers to "ptosis, miosis, and anhidrosis on the side of asympathetic palsy .... The affected pupil is visibly slow to dilate in dim light; due to a lesion of the cervical sympathetic chain or its central pathways." *Stedman's.*

His reality testing was good, and he was oriented to time, space, and person, although he did not know the exact date or day of the week. (*Id.* at 356–57). Guy's thought process was relevant, logical, and coherent; he did not exhibit unusual perceptual experiences or hallucinations. (*Id.* at 357).

Dr. Healy administered a battery of tests to Guy. (*Id.* at 356). Guy's motivation during the testing was good, and his attention span was within normal limits. (*Id.* at 357). Test results revealed that Guy functioned in the borderline range of intellectual abilities. (*Id.*). There were statistically and clinically significant differences in Guy's IQ scores suggestive of brain damage. (*Id.*). Guy's test performance was average for visual-spatial and constructional ability and below average for language. (*Id.*).

Guy's performance on memory tests was "markedly deficient," with auditory and visual immediate memory in the extremely low range. (*Id.* at 357–58). His visual memory was better than his verbal memory, but his scores remained in the low average range. (*Id.* at 358). A verbal learning test confirmed Guy's memory deficits. (*Id.*). Guy's attention, concentration, and conceptual training test results were within normal limits, while his visual tracking, motor performance, and attention results were poor and indicated "impairment and cognitive slowness." (*Id.*). With respect to reasoning and problem-solving, "Guy's performance was impaired and characterized by perseverative responses, typical of brain damaged individuals." (*Id.*).

Dr. Healy noted that Guy presented with depression and post-traumatic stress disorder. (*Id.* at 359). He concluded that Guy's mood and behavioral disturbances were directly related to the July 1996 accident and the resulting neurocognitive deficits. (*Id.* at 360). Dr. Healy opined that

these neurocognitive deficits significantly affected Guy's ability to work and maintain relationships and his emotional well-being. (*Id.*). He further opined that Guy's current work was compromised and that his choice of other employment was limited. (*Id.*). Dr. Healy described Guy's prognosis as guarded. (*Id.*). He recommended psychotherapy, cognitive rehabilitation, psychological treatment, and psychophysiological intervention. (*Id.* at 361).

From February 2004 to November 2005, Dr. Healy treated Guy weekly. (*Id.* at 362–92). During these visits, Guy complained of difficulty sleeping, familial problems, anger, and frustration with his situation. (*Id.* at 362–71, 374–92). Dr. Healy frequently described that Guy's condition during these visits as "stable." (*Id.* at 368, 375–77, 380–85, 387, 390, 391).

On October 6, 2004, at the request of Guy's counsel, Dr. Healy completed a psychological report comparing the results of recent testing to his prior findings regarding Guy. (*Id.* at 372–73). Guy's current complaints included physical pain, sleep problems, concentration difficulties, memory problems, and depression. (*Id.* at 372). Dr. Healy reported that the test results indicated "significant deterioration of memory functions," with nearly every score showing decline. (*Id.* at 373). According to Dr. Healy, the results indicated that Guy's neurological dysfunction related to his head injury remained "unresolved and permanent." (*Id.*). He found that the deterioration of Guy's memory was compromising his functioning, and that his prognosis for recovery was extremely poor. (*Id.*). Dr. Healy determined that Guy was disabled and encouraged rehabilitative work. (*Id.*).

More than one year later, on February 25, 2006, Dr. Healy completed a psychological residual functional capacity questionnaire. (*Id.* at 411–13c). Dr. Healy indicated that Guy had a marked restriction of

his daily living activities; marked deficiencies of concentration, persistence or pace; moderate difficulties in maintaining social functioning; and repeated (*i.e.*, three or more) episodes of deterioration or decompensation in work or work-like settings. (*Id.* at 412). Dr. Healy identified Guy's symptoms as poor memory, appetite disturbance with weight change, sleep and mood disturbances, personality change, emotional lability, time or place disorientation, and social withdrawal or isolation. (*Id.*). He further reported that Guy had experienced loss of intellectual ability of fifteen IQ points or more, difficulty thinking or concentrating, decreased energy, and hostility and irritability. (*Id.* at 413). According to Dr. Healy, Guy's condition was "chronic, persistent, and disabling." (*Id.* at 413A). He concluded that Guy's prognosis was poor, that the maximum level of recovery had been met, and that Guy was likely to deteriorate in the future. (*Id.*).

Dr. Healy predicted that Guy would be absent from work more than three times per month as a result of his impairments or treatment. (*Id.* at 413B). He further opined that Guy would be unable to maintain the "consistency and performance level necessary for *any* regular job." (*Id.* at 413C).

### 5. *Dr. Mary Efremov—Treating Physician*

Dr. Efremov first examined Guy on August 26, 2001. (*Id.* at 86). Guy reported that he had been suffering from memory impairment and memory lapses, as well as what sounded like untreated petit mal seizures, since the 1996 incident. (*Id.*). Dr.

Efremov observed that Guy had crepitant[9] knees and some limitation in his range of shoulder motion. (*Id.*). She suggested weight loss, an EEG, a neurology evaluation, and a possible stress test. (*Id.*).

On December 4, 2002, Dr. Efremov saw Guy again, at which time he reported difficulty concentrating and "absence seizures."[10] (*Id.* at 87). Guy also reported pain in both knees and hips, especially after prolonged sitting or standing. (*Id.*). On examination, Dr. Efremov found that Guy had bilateral shoulder and knee crepitus. (*Id.*). She suggested a low-fat diet and exercise program, as well as mental testing, neurological evaluation, and anti-seizure medication. (*Id.*).

After an office visit on August 12, 2003, Dr. Efremov completed a disability determination form for Guy. (*Id.* at 73–83). Her treating diagnoses were seizures and progressive osteoarthritis. (*Id.* at 73). She stated that Guy had experienced decreased memory and a history of petit mal seizures, as well as bilateral knee pain, hip pain, and steady back pain. (*Id.* at 74). Dr. Efremov noted that Guy used a cane and had a waddling gait. (*Id.* at 75).

Dr. Efremov reported that Guy exhibited slow speaking and thinking, a sluggish mood, and depressed affect. (*Id.* at 77). She opined that his attention and concentration were limited, and that his ability to perform calculations and insight and judgment were slow. (*Id.* at 78). She noted that Guy was able to dress and wash himself and travel on buses, but might not be able to handle subway transfers. (*Id.*).

She assessed Guy as being able to lift/carry ten pounds occasionally, to stand

---

**9.** Crepitation refers to "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." *Stedman's*.

**10.** Petit mal seizures are sometimes referred to as "absence seizures." U.S. National Li-

brary of Medicine, National Institutes of Health, Medline Plus Medical Encyclopedia, Petit Mal Seizures, http://www.nlm.nih.gov/MEDLINEPLUS/ency/article/000696.htm (last visited Apr. 15, 2009).

or walk for up to two hours, and to sit for less than six hours a day. (*Id.* at 79). She noted that his ability to push and pull was limited as a result of his shoulder pain. (*Id.* at 80). Dr. Efremov observed that Guy was neat and clean, pleasant and affable, and able to get along with the public. (*Id.*). She also noted that Guy was "very slow thinking" and had "problems retaining new information." (*Id.*).

Asked about a work setting, Dr. Efremov expressed doubt whether Guy was "swift thinking" enough to function. (*Id.* at 78). Nonetheless, she concluded that he could "function in a very simple capacity." (*Id.* at 81).

### 6. *Bellevue Hospital*

Between 1998 and 2004, Guy was examined regularly at Bellevue Hospital ("Bellevue") for a variety of complaints. At a check-up on November 13, 1998, Guy stated that he had no significant pain and was using no medication. (*Id.* at 92). He also indicated that his wife had reported that he snored and had pauses in breathing during sleep. (*Id.*). Treatment notes from February 19, 1999, indicate that Guy had a good level of energy and was exercising, and that no further abnormal breathing was reported. (*Id.* at 93).

An x-ray of Guy's lumbar spine on January 11, 2000, revealed multilevel degenerative disc disease, an osteophyte at the sacroiliac joint, and a calcified aorta. (*Id.* at 107–08). On February 11, 2000, Guy complained of lower back pain after an incident two months earlier which involved violent twisting while getting out of a cab. (*Id.* at 110).

On May 18, 2000, when Guy was seen for complaints of alternating sweats and chills, he indicated that he lived with his wife and was working as a locksmith. (*Id.* at 111). On August 3, 2000, Guy reported that he had no complaints and was not taking any medication. (*Id.* at 116).

During a check-up on October 24, 2003, Guy reported lower back pain. (*Id.* at 122). A physical examination revealed Guy to be alert, active, and not in acute distress. (*Id.*). His spine was tender in the lower lumbar region, and there was some decreased strength in his left side. (*Id.* at 123). The treatment plan included a referral to neurology because of the decreased strength on Guy's left side. (*Id.*).

On October 30, 2003, Guy was x-rayed. (*Id.* at 126). The radiologist's impression was degenerative disc disease with retrolisthesis [11] of the L3 and L4 vertebrae with no evidence of abnormal motion. (*Id.*). On November 1, 2003, Guy reported lower back pain over the prior month that radiated to his left hip and thigh. (*Id.* at 127–28). The pain began after Guy had to lift his wife who had fallen through a fire escape. (*Id.* at 128). The treatment notes reflect a diagnosis of arthritis and degenerative disc disease. (*Id.* at 132).

On November 12 and 20, 2003, Guy again was treated for severe lower back pain. (*Id.* at 133, 136). Guy reported that he had continuous pain and a decreased ability to perform household chores and sleep through the night. (*Id.* at 134). His neurological examination was normal but he had muscle spasm in his back and pain on flexion and rotation, as well as pain that limited a straight leg test. (*Id.*). Guy continued to report low back pain during a visit on December 6, 2003. (*Id.* at 145). The diagnostic impression on that date was multilevel lumbar spondylosis [12] with

---

**11.** Retrolisthesis is "the posterior displacement of one vertebral body on the subjacent vertebral body." GE Healthcare, Medcyclopaedia, Retrolisthesis, http://www.medcyclopaedia.com/library/topics/volume_

iii_l/r/retrolisthesis.aspx (last visited Apr. 15, 2009).

**12.** Spondylosis refers to "a type of degenerative disease of the spine whose most obvious

multilevel spinal stenosis [13] and small disc protrusions. (*Id.* at 146).

Notes from a visit on January 22, 2004, indicate that Guy reported a history of seizures, but that his back pain had been reduced from a "10" to a "5" or "6" on a 10–point scale. (*Id.* at 149). An MRI revealed multilevel lumbar spondylosis and disc disease with multilevel spinal stenosis and lower back neuroforaminal stenosis.[14] (*Id.* at 150). His back pain had significantly improved. (*Id.*). Guy was prescribed Motrin and Baclofen.[15] (*Id.*). At a follow-up visit on January 29, 2004, Guy's doctor noted that Guy's information processing and short-term memory were bad and referred Guy for follow-up testing with respect to possible epilepsy. (*Id.* at 157).

Guy visited Bellevue again on February 9, 2004. At that time, Guy reported that his back pain improved with medication, but worsened when he was standing or walking. (*Id.* at 163). Physical examination revealed that Guy had difficulty ambulating and a wide-based gait with flexed knees. (*Id.*). He had some pain on low back extension, and mild tenderness to touch in the region of his lower back and buttocks. (*Id.*). The diagnosis was low back pain possibly secondary to spinal stenosis. (*Id.*). The clinic doctor recommended a trial of acupuncture, physical therapy three times per week for one month, flexion-based exercises, low back

education, and ibuprofen/tylenol codeine for pain. (*Id.*).

Guy began physical therapy on February 11, 2004. (*Id.* at 167). He was unable to tolerate many of the test positions, which initially resulted in an inconclusive evaluation. (*Id.*). After the evaluation was completed the following day, the physical therapist recommended a course of treatment. (*Id.* at 168). Guy attended physical therapy sessions nine times between February 26 and July 29, 2004. (*Id.* at 169, 172–77, 189–90, 197–98, 212–13, 254–55, 258–59). He also attended ten physical therapy sessions between January 27 and April 21, 2005. (*Id.* at 265–80, 283–86).

Meanwhile, Guy continued to be evaluated at Bellevue. A brain MRI on February 27, 2004, was normal. (*Id.* at 171). A check-up on March 31, 2004, resulted in normal findings on physical and neurological examination, and Guy reported no pain issues. (*Id.* at 178–79). His diagnosis was general convulsive epilepsy. (*Id.* at 184). The treatment notes indicated an abnormal EEG, suggesting left temporal structural abnormality, and called for a further brain MRI. (*Id.*).

Guy denied any pain issues during an April 1, 2004, visit, although he had some thyroid problems. (*Id.* at 185–65). On April 12, 2004, Guy reported that physical

---

pathologic and radiographic finding is the presence of osteophytes, especially along the anterior and lateral aspects of the vertebral column." GE Healthcare, Medcyclopaedia, Spondylosis Deformans, http://www.medcyclopaedia.com/library/topics/volume_iii_l/s/spondylosis_deformans.aspx (last visited Apr. 15, 2009).

**13.** Spinal stenosis refers to "narrowing of the spinal canal, nerve root canals, or intervertebral foramina due to spondylosis and degenerative disk disease." WebMD, eMedicine, Spinal Stenosis, http://emedicine.medscape.

com/article/247887–overview (last visited Apr. 15,2009).

**14.** Degenerative foraminal stenosis refers to "narrowing of the neural foramina of the spine, mainly cervical and lumbosacral, due to degenerative hypertrophy of the bony cartilaginous structures that delineate their contour." GE Healthcare, Medcyclopaedia, Degenerative Foraminal Stenosis, http://www.medcyclopaedia.com/library/topics/volume_vi_l/d/degenerative_foraminal_stenosis.aspx (last visited Apr. 15, 2009).

**15.** Baclofen is a muscle relaxant. *Stedman's.*

therapy had lessened his lower back pain, which he rated as a "4" on a 10–point scale. (*Id.* at 193). He also observed that his pain improved during the day with rest, but worsened after activities. (*Id.*). That same day, Guy met with a social worker from Bellevue's Department of Social Work who noted that he was walking with a cane. (*Id.* at 195–96). Guy told the social worker the facts regarding his back injury in October 2003. (*Id.* at 195). Guy also reported that his landlord's effort to evict his family from their apartment was causing strain on the family. (*Id.*). Guy related well to the social worker, who said she would see him as needed for future visits. (*Id.* at 196).

On April 21, 2004, Guy was seen by the Bellevue Department of Psychiatry, at which time he complained of irritability and depression due to his landlord's efforts to evict him. (*Id.* at 199–200). Guy reported some paranoid ideation, but denied hopelessness, worthlessness, or suicidal ideation. (*Id.* at 200). He also reported some auditory hallucinations. (*Id.*). On mental status examination, Guy's mood was depressed and his affect was irritable and guarded. (*Id.* at 204). He was appropriately groomed, and his thought process was goal-directed, with his judgment adequate for basic needs. (*Id.*). Guy was discharged in stable condition without medications, but with an appointment scheduled in the crisis clinic. (*Id.* at 205–06).

Guy visited Bellevue again on May 7, 2004, complaining of low back pain stemming from the fire escape incident. (*Id.* at 214). Guy denied having any back pain prior to that event which he claimed took place in January 2003. (*Id.*). Guy described the pain as sharp, constant, and shooting, located in his lower back and going down both legs behind both knees. (*Id.*). He rated his pain as "6–7/10." (*Id.*). A physical examination revealed diffuse tenderness in Guy's lumbar-sacral area, with limited range of motion in the lumbar-sacral joint. (*Id.*). There was a slight decrease of sensation and muscle strength in both legs. (*Id.*). Guy reported a decreased ability to engage in physical activity, perform household chores, and work. (*Id.* at 215). He was directed to continue acupuncture treatments and was prescribed 5 percent Lidoderm,[16] and 50 mg Ultram.[17] (*Id.*). He refused a lumbar epidural steroid injection. (*Id.*).

Guy was examined by the Bellevue neurology department on May 11, 2004, in connection with his seizures, after having stopped taking his anti-epileptic drugs. (*Id.* at 216). His EEG results were normal. (*Id.*). During a series of visits in June and July, 2004, Guy complained of complications from diabetes and hyperthyroidism, but did not report back pain or seizures. (*Id.* at 217–53, 256–57).

Several months later, on November 4, 2004, Guy reported that his back pain was severe prior to acupuncture, but reduced after each treatment. (*Id.* at 263). He was not taking any pain killers at the time. (*Id.*). Guy reported that he could walk around the block comfortably with a cane, but would need to sit down when he had pain. (*Id.*). His pain was exacerbated by excessive flexion or extension. (*Id.*). Some spinal tenderness was noted on physical examination, as well as an abnormal gait. (*Id.*). Guy was directed to continue his acupuncture treatments. (*Id.* at

16. Lidoderm is "used to relieve the pain of Post–Herpetic Neuralgia, also referred to as post-shingles pain." Endo Pharmaceuticals, Lidoderm, http://www.lidoderm.com/ (last visited Apr. 15, 2009).

17. Ultram is narcotic-like product "used in the management of moderate to moderately severe pain." MedicineNet, Ultram, http://www.medicinenet.com/tramadol/article.htm (last visited Apr. 15, 2009).

264). Subsequently, during an April 11, 2005, visit, Guy reported that he had "no pain issues." (*Id.* at 281).

### 7. *Hearing Testimony*

#### a. *Dr. Warren Cohen*

Neurologist Dr. Warren Cohen testified during the hearing based upon his review of the medical records and the testimony of Guy and Mrs. Guy. (*Id.* at 483). He opined that Guy had degenerative and diskogenetic disease of the lumbar spine, stating that the x-rays in evidence confirmed that the degenerative disc disease dated back to at least January 11, 2000. (*Id.* at 484, 492). Dr. Cohen explained that Guy's spine problems had been treated primarily with physical therapy and acupuncture therapy, muscle relaxers, and anti-inflammatory agents, with variable results. (*Id.* at 485). Dr. Cohen also noted that Guy had a history of headaches and seizures, as well as obstructive sleep apnea, diabetes, and hypothyroidism. (*Id.* at 484).

Dr. Cohen testified that Guy's care providers had concluded that his cognitive symptoms resulted from the head trauma he suffered in 1996, and that his file revealed no information to support an alternative medical diagnosis. (*Id.*). Dr. Cohen further noted, however, that Guy's head injury constituted a "mild head trauma," which typically would not cause a progressive cognitive decline. (*Id.* at 484–85). He indicated that "from a neurological perspective" it therefore was difficult to attribute the cognitive problems that Guy described to his head trauma, although he acknowledged that this sometimes might occur. (*Id.*).

When he was asked about Guy's post-concussion headaches, Dr. Cohen stated that some medical literature suggested that persistent headaches could occur following an episode of head trauma, but that chronic headaches also could be caused by other factors. (*Id.* at 488). He stated that in Guy's case, the treatment notes do not reflect a careful longitudinal evaluation of the cause of the headaches. (*Id.* at 489). Instead, after his headaches initially were attributed to the head trauma, later treatment notes simply reiterated that finding. (*Id.*). Dr. Cohen added that there were a number of other possible explanations for the headaches. (*Id.* at 491).

Dr. Cohen opined that Guy did not have a severe physical impairment from 1996 to October 2003, but that he did have a severe physical impairment related to his back since October 2003. (*Id.* at 486). Dr. Cohen stated that as a consequence of this impairment, Guy was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, standing, walking, and sitting for six hours each day, and kneeling, crouching, and crawling occasionally. (*Id.*). He added that Guy also was limited with respect to heights, hazards, and dangerous equipment based on his history of seizures, and that this limitation existed from 1996 to the present. (*Id.*).

#### b. *Dr. Michael Friedman*

Psychologist Dr. Michael Friedman also testified at the hearing based on his review of the record and the testimony. (*Id.* at 493). He opined that the evidence did not support any finding of a significant mental impairment and that the findings at the time of Guy's head injury did not indicate any brain damage. (*Id.* at 494). Dr. Friedman acknowledged that Dr. Healy's testing revealed some deficits, but indicated that he did not accept those findings because he thought that Guy's hearing testimony was not credible. (*Id.*). As he explained, the extensive difficulties that Guy claimed to have with respect to remembering significant life events and locations in his own neighborhood were more consistent with someone who had severe dementia than a person who had a head injury. (*Id.*). He also agreed with Dr.

156

Cohen that a closed-head injury, such as a concussion, usually results in an improving course of events rather than the deteriorating course of events Guy described. (*Id.*).

Dr. Friedman also noted inconsistencies in the record. For example, when he met with a Bellevue social worker on April 12, 2004, Guy had an adequate memory of his life events, which seemed inconsistent with his denial of memory of those events during the hearing. (*Id.* at 496). Dr. Friedman noted that the record also did not indicate that Guy had received any medication for his psychiatric problems. (*Id.* at 498). The doctor further observed that it was inconsistent with post-concussion syndrome for Guy to have returned to work shortly after the incident, at one point working full time as a locksmith, especially since locksmithing work is a "fairly skilled kind of thing" that would be difficult to accomplish with cognitive deficits. (*Id.* at 498–99). He added that Guy's complaints of memory problems were inconsistent with his doctors' findings that his cognitive functions were normal. (*Id.* at 500).

c. *Guy and Mrs. Guy*

Guy also testified about his medical history during the hearing. Guy stated that he suffered from headaches and back and leg pain. (Tr. 437–38). He said that he had been having problems with his back for a "long time," but could not estimate how long. (*Id.* at 438–39). Guy stated that his lower back hurt every day, all day. (*Id.* at 442). He noted that his headaches occurred approximately once every other week and lasted all day. (*Id.* at 439). To treat the headaches, Guy would lie down for the entire day. (*Id.*). He stated that he experienced some relief from his back pain after acupuncture, but discontinued that treatment on the advice of his doctor. (*Id.* at 443). He also stated that he became nauseous if he took medication for the pain. (*Id.*).

Mrs. Guy also testified about Guy's medical history. She reported that he had suffered from grand mal epileptic seizures for at least fifteen years. (*Id.* at 466). In "the 2000's," she began noticing blood on his pillow, and he was diagnosed with sleep apnea. (*Id.* at 467). Mrs. Guy explained that Guy began displaying confusion, forgetfulness, irritability, and personality changes in 1998. (*Id.*). She testified that there had been a slow negative progression with respect to Guy's mental health since the accident, although she noted that he had not been as irritable lately as he was during the first few years. (*Id.* at 470). Mrs. Guy acknowledged that Guy had various back difficulties throughout his life, but stated that they worsened after the October 2003 fire escape incident. (*Id.* at 475). Mrs. Guy testified that at the time Guy filed his social security application in September 2003, he was forgetful and suffering from headaches. (*Id.* at 476–77). According to her, by January 2003, Guy had difficulty focusing, suffered from headaches, and would leave the house less frequently. (*Id.* at 478).

C. *ALJ Decision*

On March 15, 2006, ALJ Levin issued a decision in which he found that Guy was not disabled within the meaning of the Act by virtue of concussion syndrome, low back pain, arthritis, seizures, or psychiatric problems. (*Id.* at 15). After summarizing the evidence, the ALJ conceded that it was "most unusual to reject outright the opinion of a treating psychologist or other doctor," but noted that Dr. Friedman's hearing testimony strongly called into question the accuracy of the representations that Guy—and "by extension" Mrs. Guy—had made to Dr. Healy, Guy's treating psychologist. (*Id.* at 25). Specifically, the ALJ noted that Guy's head injury was minor and not expected to cause the later-onset and progressively-deteriorating cognitive

symptoms that Guy described. (*Id.*). The ALJ also found that Guy did not have any "severe" mental problems until early 2000 at the earliest. (*Id.*).

The ALJ further noted that Dr. Healy did not become a treating physician until 2004. (*Id.*). Dr. Healy was initially consulted in connection with pending litigation and, at which time he rated Guy as severely mentally impaired. (*Id.*). The record shows, however, that Guy was working at that point as a locksmith and also "to some extent" as a martial arts trainer. (*Id.*). Moreover, a detailed social work assessment in the late spring of 2004 found Guy to be in full command of his faculties. (*Id.*). For these reasons, and in light of Guy's own testimony, which he found was not credible, the ALJ rejected the notion that Guy had PTSD or other severe cognitive problems prior to 2000. (*Id.*). In particular, the ALJ found it "impossible to believe" that Guy did not know that his wife was operating a martial arts business in their loft. (*Id.*). Nonetheless, he determined that Guy had been seeing Dr. Healy for a reason other than mere claim-building, and that Guy had a " 'severe' depressive disorder NOS since approximately February 1, 2004." (*Id.* at 25–26).

Turning to Guy's physical impairments, notwithstanding Guy's chronic headaches, the ALJ found that he did not have a severe impairment prior to October 2003. (*Id.*). Giving Guy the benefit of the doubt, however, the ALJ found despite Guy's intermittent work history that his headaches would have limited him to simple, unskilled work activity as early as July 8, 1996. (*Id.*).

The ALJ found no evidence that Guy had a seizure disorder prior to 2004. (*Id.*). As he noted, there was no mention of a seizure disorder in Guy's GMMS records. (*Id.*). Moreover, even if Guy had such seizures, they did not prevent him from working as a martial arts teacher and locksmith. (*Id.*).

By contrast, the ALJ found that Guy did have degenerative disc and joint disease as of October 4, 2003, the date that he rescued Mrs. Guy from the fire escape, and that this condition would have limited Guy to "light exertional activity," as Dr. Cohen described. (*Id.* at 27). Moreover, the ALJ found that when Guy's depressive disorder became severe in February 2004, it limited Guy to simple and routine work activity, even though it did not affect his ability to interact with other people. (*Id.*).

Turning to the required sequential evaluation, ALJ Levin noted that the record and testimony were unclear with respect to Guy's work history. (*Id.*). Nevertheless, the ALJ concluded at Step One that Guy had not performed any substantial gainful activity since his alleged onset date. (*Id.*).

At Step Two, the ALJ determined that Guy's only severe impairment dating back to the alleged onset date and lasting for the required time period was his tension headaches. (*Id.*). The ALJ found that at that stage, Guy did not have PTSD, a severe musculoskeletal condition, or post-concussion syndrome. (*Id.* at 27–28). Nevertheless, the ALJ determined that as of October 4, 2003, Guy suffered from severe degenerative disc disorder and joint disease of his lumbosacral spine, that as of January 1, 2004, Guy had occasional nocturnal seizures which barely crossed the threshold of severe, and that as of February 1, 2004, Guy had a severe depressive disorder NOS. (*Id.* at 28–29). The ALJ found at Step Three that these conditions did not meet or medically equal a listed impairment. (*Id.* at 29).

Turning to Step Four, the ALJ found that as of the alleged onset date, Guy had the mental residual functional capacity to perform simple and routine work. (*Id.*).

He further found that as of October 4, 2003, Guy had the exertional capacity to lift/carry twenty pounds occasionally and ten pounds frequently, and to sit and stand or walk for at least six hours in an eight-hour work day. (*Id.*). Finally, he concluded that as of January 1, 2004, Guy had to avoid working at unprotected heights or around dangerous equipment. (*Id.*).

The ALJ further determined that Guy's past relevant work as an elevator operator "did not require the performance of work-related activities precluded by his residual functional capacity" and that his medically-determinable headaches, degenerative disc and joint disease, seizures, and depression did not prevent him from performing his past relevant work. (*Id.*). Accordingly, the ALJ denied Guy's entire claim at Step Four of the analysis, stating that Guy was not under a disability at any time from the July 8, 1996, alleged onset date through the hearing date. (*Id.*).

### III. *Applicable Law*

#### A. *Standard of Review*

Under Rule 12(c), a party is entitled to judgment on the pleadings if it establishes that no material facts are in dispute and that it is entitled to judgment as a matter of law based on the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988); *Carballo ex rel. Cortes v. Apfel*, 34 F.Supp.2d 208, 213–14 (S.D.N.Y.1999).

■ The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir.2002); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)) (internal quotation marks omitted).

■ A court is not permitted to review the Commissioner's decision *de novo*. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.2004) (citing *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998)). Rather, when the Commissioner's determination is supported by substantial evidence, the decision must be upheld. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990); *Ortiz v. Barnhart*, No. 00 Civ. 9171(RWS), 2002 WL 449858, at *4 (S.D.N.Y. Mar. 22, 2002).

#### B. *Disability Determination*

The term "disability" is defined in the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In making a determination as to a claimant's disability, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920. The Second Circuit has described that familiar process as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the

regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)); *accord Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002).

▮ The claimant bears the burden of proof with respect to the first four steps of the process. *DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998). If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, he is not required to proceed with any further analysis. *See* 20 C.F.R. § 404.1520(a)(4); *Williams v. Apfel,* 204 F.3d 48, 49 (2d Cir.1999). However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work. *DeChirico,* 134 F.3d at 1180. In assessing disability, the factors to be considered include "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." *Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir. 1980).

## IV. *Application of Facts to Law*

Despite several attempts to inform Guy of his right to file papers in opposition to the Commissioner's motion (*see* Docket Nos. 11–13), he has not done so. Guy thus has not explained the basis on which he contests the correctness of the ALJ's findings. I nevertheless have carefully considered the evidentiary support for the ALJ's findings and whether he correctly applied the law. I conclude that there is, with two exceptions, substantial evidence to support the Commissioner's findings at each of the first four steps of the sequential evaluation. As explained in further detail below, the exceptions do not entitle Guy to any relief from this Court or the Commissioner.

### A. *First Step*

The first step of the sequential analysis asks whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At the hearing before the ALJ, Guy testified that he could not recall the details of his work history, acknowledging only that he had at some point worked as an elevator operator and martial arts instructor. (Tr. 433–36). Although the ALJ was skeptical of Guy's claimed memory lapses, he concluded that Guy had not engaged in substantial gainful activity since his alleged onset date of July 8, 1996. (*Id.* at 27). This finding benefitted Guy.

### B. *Second Step*

At the second step of the sequential process, the ALJ must determine whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4). A severe impairment is one that "significantly limits the abilities and aptitudes necessary to do most jobs." *Bowen v. Yuckert,* 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (quoting 20 C.F.R. §§ 404.1520(c) & 404.1521(b)) (internal quotation marks omitted).

■ The ALJ determined that Guy's tension headaches were severe as of his alleged onset date in 1996. (Tr. 27). Consistent with that finding, the record shows that Guy reported suffering from headaches immediately after his injury in 1996, (*id.* at 352), during follow-up visits with Dr. Friedman in 1996–98, (*id.* at 301, 401, 404), and during visits to Dr. Helft in 1997 and 1998. (*Id.* at 335, 337). Guy also reported daily headaches to Dr. Shields in May 1999, (*id.* at 407), and occasional headaches to Dr. Jacobson in February 2000. (*Id.* at 339). There consequently is substantial evidence to support the ALJ's finding.

■ Turning to degenerative disc and joint disease, the ALJ correctly determined that the record does not indicate *consistent* symptoms stemming from this condition until October 2003. Indeed, during a doctor's visit on May 7, 2004, Guy denied having any back pain prior to the October 2003 incident. (*Id.* at 214). The first indication of any possible lower back problems was on January 11, 2000, when an x-ray of Guy's lumbar spine revealed multilevel degenerative disc disease. (*Id.* at 107). However, Guy did not report any lower back problems during his medical visits over the next two years. Thereafter, on December 4, 2002, Guy reported pain in both his knees and hips. (*Id.* at 87). Nine months later, on August 12, 2003, Dr. Efremov reported that Guy had experienced bilateral knee pain, hip pain, and back pain. (*Id.* at 74).

Guy first began reporting lower back pain consistently following the incident in October 2003 when he tried to lift his wife. (*Id.* at 123, 126–28, 133, 136, 145, 163, 214, 263). Test results and diagnoses from that period revealed that Guy had degenerative disc disease and multilevel lumbar spondylosis with multilevel spinal stenosis. (*Id.* at 126, 146, 150, 163). Guy's complaints at that time, taken together with the diagnostic findings, provide substantial evidence that Guy had severe degenerative disc and joint disease beginning in October 2003.

■ On the other hand, the record suggests that the ALJ may have erred with respect to the onset date for Guy's depression and seizure disorder. The record confirms that Guy did not begin receiving treatment for depression until February 2004, when he began weekly sessions with Dr. Healy. (*Id.* at 362–92). He also was seen at the Bellevue psychiatric department for depression in April 2004. (*Id.* at 199–200). However, there were some signs of depression in earlier years. Indeed, just four days after the 1996 incident, Guy reported that he had experienced depression. (*Id.* at 301). Similarly, in May 1999, Dr. Shields diagnosed Guy as suffering from post-traumatic stress disorder with depression, and Dr. Healy diagnosed depression as of April 2000. (*Id.* at 359, 409). Dr. Efremov also reported in August 2003, that Guy displayed a sluggish mood and depressed affect. (*Id.* at 77). In his decision, the ALJ recognized that Guy may have had "severe" psychiatric or psychological symptoms beginning in early 2000. (*Id.* at 25). If so, he may have had severe depression prior to the February 1, 2004, onset date that the ALJ determined.

■ As for the seizure disorder, the ALJ found that Guy first reported this condition to his examining physician at Bellevue on January 22, 2004. (*Id.* at 26, 149). Indeed, Guy was examined by the Bellevue neurology department in connection with the seizures on May 11, 2004. (*Id.* at 216). However, the medical evidence indicates that Guy had begun to report the occurrence of seizures several years earlier, during his visits to Dr. Efremov on August 26, 2001, December 4, 2002, and August 12, 2003. (*Id.* at 73, 86, 87). During her testimony, Mrs. Guy also indicated that Guy had suffered from sei-

zures for at least fifteen years, beginning in 1979. (*Id.* at 466). These earlier reports of seizures suggest that Guy's seizure disorder may have been severe earlier than January 22, 2004.

### C. *Third Step*

The third step of the sequential evaluation asks whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of 20 C.F.R. § 404, Subpart P ("Appendix 1"). If so, the Commissioner must find that the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). In that regard, although the ALJ did not detail the reasons for his determination, he did correctly determine that Guy's ailments failed to meet or medically equal a listed impairments. (Tr. 29).

 First, there is no listing criteria for tension headaches or anything similar. With respect to degenerative disc disease, the relevant listing is Section 1.04 of Appendix 1, concerning disorders of the spine. To meet the SSA's requirements, such spine disorders must be supported by evidence of either (1) nerve root compression, which, with respect to the lower back, would be characterized by a positive straight-leg raising test; (2) spinal arachnoiditis, which results in the need to change positions more than once every two hours; or (3) lumbar spinal stenosis, which results in inability to ambulate effectively. Appendix 1 §§ 1.04(A)-(C). To ambulate effectively, a claimant must be able to "sustain[ ] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *Id.* 1.00(B)(2).

Diagnostic impression and MRI results from December 2003 and January and February 2004 indicate that Guy had multilevel spinal stenosis. (Tr. 146, 150, 163). On physical examination in February 2004, Guy had difficulty ambulating and indicated that his back pain worsened with walk-

ing. (*Id.* at 163). In May 2004, Guy also reported a decreased ability to engage in physical activity, perform household chores, and work. (*Id.* at 215). By November 2004, however, Guy indicated that he could walk around the block comfortably with a cane. (*Id.* at 263). Thus, while Guy apparently experienced some discomfort when walking, the medical evidence does not indicate that he was, or could be expected to be, unable to ambulate effectively for a continuous period of at least twelve months. *See* 42 U.S.C. § 423(d)(1)(A).

 Turning to depression, to satisfy the listing criteria under Section 12.04, a claimant, insofar as relevant, must demonstrate *either* the presence of enumerated symptoms (under paragraph A) plus at least two enumerated difficulties in daily living, social functioning or concentration, persistence or pace (under paragraph B), or (2) a chronic affective disorder of two years' duration affecting basic work activities, plus (under paragraph C) at least one of the following: repeated decompensation episodes, a residual disease process, or a one-year history of inability to function outside of a supportive living arrangement. Appendix 1 § 12.04(A)-(C).

Guy had several of the listed symptoms of depression, including sleep disturbance, difficulty concentrating, and appetite disturbance. *Id.* § 12.04(A)(1). Nevertheless, despite these symptoms, Guy was able to complete many daily living activities and function socially. (Tr. 78, 80–81, 441–42, 444). There also was no evidence that his depression met any of the criteria under paragraph C.

 Finally, the listing for epilepsy with petit mal seizures requires that the seizures occur more frequently than once weekly in spite of at least three months of treatment. Appendix 1 § 11.03. To meet this listing, the claimant also must experi-

162

ence "alteration of awareness or loss of consciousness and transient postictal [18] manifestations of unconventional behavior or significant interference with activity during the day." *Id.* Here, the record does not suggest that Guy's seizures met these requirements. At best, the occurrence of petit mal seizures is reported. However, they are not described in detail, (*see* Tr. 73, 86–87, 149, 216), nor is there any indication that the seizures affected Guy's daily activities.

Having failed to find that Guy had a listed impairment, the ALJ properly progressed to the fourth step.

### D. *Fourth Step*

In the fourth step of the sequential evaluation, an ALJ must determine a claimant's residual functional capacity ("RFC"), or what the claimant can do despite his or her impairments. 20 C.F.R. § 404.1545(a)(1). If the claimant can still perform his past work, the ALJ must find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

 In his decision, ALJ Levin determined that Guy was able to perform his past relevant work as an elevator operator despite his severe impairments. (Tr. 29). In reaching this conclusion, the ALJ determined that work as an elevator operator "clearly is compatible with a restriction to simple and routine activity, as the vocational expert testified." (*Id.* at 28). As the ALJ explained, for most of the relevant period, Guy's restrictions were non-exertional only; thereafter, even when he was subject to exertional limits after October 2003, Guy had the RFC to work as an elevator operator. (*Id.*). The ALJ found the onset of depression and seizures did not affect Guy's ability to work as an elevator operator. (*Id.*).

The record supports the ALJ's conclusion. Guy reported returning to light security work within months of the accident and worked as a locksmith and martial arts instructor at other times during the relevant period. (*Id.* at 100, 111, 335, 339, 355). The vocational expert characterized locksmithing as light duty skilled labor, and martial arts teaching, security work, and elevator operation as light duty as well. (*Id.* at 504). It stands to reason that if Guy was able to complete other light duty work during the time of his claimed disability, some of which is considered skilled labor, he could work at the unskilled light duty job of elevator operator. Since Guy could engage in his past relevant work, the ALJ properly determined that he was not disabled within the meaning of the Act.

### V. *Conclusion*

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket No. 9) is granted. The Clerk of the Court also is directed to close this case.

18. Postictal means "[f]ollowing a seizure." *Stedman's.*